STATE OF NORTH CAROLINA v. JOHN IVEY SANDLIN

No. 828SC1044

(Filed 5 April 1983)

**1. Homicide § 21.7— second degree murder—sufficiency of evidence**

The State's evidence was sufficient to support defendant's conviction of second degree murder of his wife where it tended to show that the cause of death was mechanical strangulation; the victim was last seen in the presence of the defendant on the day she disappeared; defendant's car was seen backed into the carport with the trunk lid open shortly after defendant's neighbors last saw the victim alive; a cloth binding, similar in color and texture to defendant's bathrobe belt, was found wrapped tightly around the victim's neck; defendant had asked the local cemetery operator about a road running behind the cemetery to a row of pine trees where the body was eventually discovered; defendant had previously slapped and kicked the victim and once held a knife to her neck and threatened her life; and defendant had a motive to kill the victim in that the victim was troubled by defendant's earlier marriage to another woman from whom he had never received a divorce, the victim had discussed the matter with defendant and had also sought an attorney's advice, and the other woman had indicated an unwillingness to agree to a divorce because of the medical benefits she received as a military dependent.

2. **Constitutional Law § 31— refusal to appoint investigator and expert witness for indigent defendant**

The trial court did not abuse its discretion in the denial of an indigent defendant's request for a court appointed investigator and expert witness where there was no showing that any evidence other than that presented at trial was reasonably available or that it would have assisted in preparation of a defense. G.S. 7A-454.

3. **Criminal Law § 51— qualification of witness to testify as expert**

Even had defendant properly objected to the admission of a State's witness as an expert in the field of dyestuffs, a sufficient foundation was laid for qualification of the witness as an expert to permit him to express an opinion about the original color of a binding found around a homicide victim's neck.

4. **Criminal Law § 87; Witnesses § 1— permitting interpreter to translate testimony of witness**

The trial court in a homicide case did not err in permitting an interpreter to translate the trial testimony of the victim's Vietnamese mother where the witness testified through the interpreter that she spoke very little English, and where the qualifications of the interpreter were properly shown by the State.

5. **Criminal Law § 122.2— additional instructions urging jury to agree**

The trial court, after being informed that the result of the jury's vote was nine to three, did not err in instructing the jury that they should do everything they could to reach a verdict where the court also instructed that no juror should surrender his or her honest convictions solely because of the opinion of fellow jurors or for the mere purpose of returning a verdict. G.S. 15A-1235(c).

6. **Criminal Law § 138— second degree murder—aggravating and mitigating factors**

In imposing a sentence for second degree murder, the trial court did not err in finding that murder by strangulation was an especially heinous and cruel crime which outweighed defendant's lack of a criminal record, and the court properly imposed a sentence in excess of the presumptive sentence.

APPEAL by defendant from *Llewellyn, Judge.* Judgment entered 14 May 1982 in Superior Court, LENOIR County. Heard in the Court of Appeals 17 March 1983.

Defendant was charged in a proper bill of indictment with the murder of Linda Nguyen Sandlin. Defendant pleaded not guilty to the charge of first degree murder, but was convicted of second degree murder. From a judgment imposing a prison sentence of thirty-five years, defendant appealed.

*Attorney General Rufus L. Edmisten, by Assistant Attorney General George W. Boylan for the State.*

*Marcus, Whitley and Coley, by Robert E. Whitley, for the defendant, appellant.*

HEDRICK, Judge.

[1]  The defendant first assigns error to the trial court's denial of his motion to dismiss at the conclusion of all the evidence. The evidence presented at trial tended to show the following. The defendant and the victim, Linda Nguyen Sandlin, were married in Vietnam in the early 1970's. The couple left Vietnam in 1973 and eventually settled in Las Vegas. In April of 1981 they moved to Pink Hill, North Carolina.

On or about 28 May 1981, Linda Sandlin visited an attorney to find out if her husband, the defendant, had been properly divorced from his earlier marriage to Mildred Sandlin. Mildred Sandlin and the defendant were married in 1947. They separated in 1967, but they had never obtained a divorce. As a result of Linda Sandlin's visit, her attorney wrote Mildred Sandlin asking if the defendant had ever obtained a divorce from her, but Mildred Sandlin never responded to the letter. On 10 July 1981 the defendant called Mildred Sandlin concerning a possible visit to see her. During that conversation Mildred Sandlin brought up the subject of the attorney's letter. Defendant replied, "That's something Linda's started." Later in the day, Mildred Sandlin called the defendant's sister and told her that because of her military dependent status she had been receiving "medication" and she did not want to lose that. The defendant testified he and Linda had discussed often the idea of getting a divorce from Mildred Sandlin and "what might happen in the case I passed away." Also, the decedent had expressed to the defendant's niece, Joann Stroud, her fear of losing her savings "in a home that would not be hers if something happened to John [Sandlin] because she had reason to believe that he had a legal wife living."

The State's witness, Jeff L. Moody, Sr., who lived next door to the defendant and the decedent, testified that he last saw Linda Sandlin on 21 July 1981 between 9:30 a.m. and 11:00 a.m. hanging a dress on her clothesline. Another witness, Lawton Earl Howard, testified he passed the defendant's home several times

on 21 July 1981 while transporting tobacco to his barn. He testified that he was driving by at approximately 9:00 a.m. or 9:30 a.m. and saw the defendant with a small woman whom he described was of a nationality other than American. On this occasion the defendant's car was parked in the carport with the front end facing in. When Mr. Howard passed by again at approximately 11:30 a.m. he noticed the defendant's car was backed into the carport. The trunk was about even with the doorsteps and the trunk lid was open. Two days later, on 23 July 1981, the defendant reported the victim as missing and stated he had last seen her at 1:45 or 2:00 p.m. on 21 July 1981.

On 14 September 1981 the victim's body was found in a grave located near a group of pine trees behind Oak Ridge Memorial Cemetery in Pink Hill, North Carolina. The owner and operator of the cemetery, James Clifton Tyndall, testified that sometime during July the defendant had asked him if there was a road that went back to the cemetery to a row of pine trees. That conversation, along with the defendant's inquiries into the purchase of burial plots at the cemetery and the county sheriff's comments to Mr. Tyndall that foul play was suspected in connection with the victim's disappearance, prompted Mr. Tyndall's search of the area which resulted in locating the body.

In the medical examiner's opinion, the victim was dead when placed in the ground and had been buried for approximately two months. The cause of death was determined to be mechanical strangulation. A cloth ligature or binding was wrapped tightly around the decedent's neck. Expert testimony revealed the cloth ligature was a dull blue or dull heavy blue velour fabric.

Defendant's neighbor, Jeff Moody, Sr., testified that during visits to defendant's home he had seen the defendant wearing a dark blue bathrobe made of "the type of material that a regular downy towel is made of." The bathrobe had a belt of the same color and material that was about three feet long and an inch and a half wide.

On 16 September 1981 an S.B.I. agent told the defendant his wife had been found and read a search warrant to him. The defendant stated to the agent that he sensed they were "building a case, a murder case against him and that anything he would say would be incriminating if he said it." A couple of weeks before

Christmas, 1981, defendant visited a friend in Florida "checking on some information he had as to who was responsible . . ." for his wife's death. He remained in Florida until February.

Prior to Linda Sandlin's murder, her mother had seen the defendant hold a knife to Linda's neck and threaten to cut her throat in February 1979. On other occasions the mother had seen the defendant hit her daughter and kick her in the back. The defendant himself admitted he had slapped Linda before, and she had threatened to leave him "a hundred times." A long-time friend of the defendant, Anthony W. Shaw, testified that during a conversation with the defendant in Las Vegas the defendant stated: "The best way that you could do away with a person would be to get a piece of wire and put [it] around their neck and strangle them. . . ."

The standard for determining whether the evidence is sufficient to withstand a motion to dismiss is whether the evidence raises a reasonable inference of the defendant's guilt. *State v. Cutler*, 271 N.C. 379, 156 S.E. 2d 679 (1967). Considered in the light most favorable to the State, the evidence does support a reasonable inference that the defendant murdered Linda Sandlin. The evidence demonstrates the defendant's motive, an opportunity to commit the crime and a connection between the murder weapon and the defendant. Furthermore, the defendant's trip to Florida, his delay in reporting his wife's disappearance and his comment that the best means of committing a murder was by strangulation all add to the reasonableness of a conclusion that the defendant committed the crime.

The victim was last seen in the presence of the defendant on the day she disappeared. The defendant's car was seen backed into the carport with the trunk lid open shortly after the defendant's neighbors last saw Linda Sandlin alive. A cloth ligature similar in color and texture to the defendant's bathrobe belt, was found wrapped tightly around the decedent's neck. The defendant had also asked the local cemetery operator about a road running behind the cemetery to a row of pine trees where the body was eventually discovered.

The evidence showed past instances of violence by the defendant toward his wife. He had slapped and kicked her and once held a knife to her neck and threatened her life. By his own

admission, the defendant had slapped the victim before. He also testified she had threatened to leave "a hundred times."

The victim was troubled by the defendant's earlier marriage to Mildred Sandlin, from whom he had never received a divorce. She was concerned about her financial security and her interest in the marital home if the defendant predeceased her without having divorced Mildred Sandlin. Linda Sandlin had discussed the matter with the defendant, her husband, and had also sought an attorney's advice. Despite a letter from Linda Sandlin's attorney, Mildred Sandlin indicated an unwillingness to agree to a divorce because of the medical benefits she received as a military dependent. The defendant told Mary Ann Sanderson that he and Linda had planned a trip to Maryland to see Mildred Sandlin, presumably to discuss a divorce. From this evidence, a jury could reasonably infer that the defendant, caught between the competing interests of his two wives, had a motive to kill Linda Sandlin.

Even though the evidence presented was entirely circumstantial, the combination of circumstances and coincidences allows a reasonable inference of defendant's guilt. The evidence did more than simply cast suspicion on the defendant. It supplied a motive, demonstrated past hostility toward the victim, connected the murder weapon to the defendant and connected the defendant to the place where the body was buried. Therefore, the trial court did not err in denying defendant's motion to dismiss on grounds of insufficient evidence.

[2] The defendant next argues the trial judge erred in denying his motions for funds to hire an investigator and expert witness. He contends such a request should have been granted under N.C. Gen. Stat. § 7A-454 which provides:

> The court, in its discretion, may approve a fee for the service of an expert witness who testifies for an indigent person, and shall approve reimbursement for the necessary expenses of counsel. Fees and expenses accrued under this section shall be paid by the State.

Thus, the grant or denial of motions for appointment of associate counsel or expert witnesses lies within the trial court's discretion and a trial court's ruling should be overruled only upon a showing of abuse of discretion.

Our Supreme Court noted the applicable standard for appointment of expert assistance to indigent defendants in *State v. Johnson*, 298 N.C. 355, 362-363, 259 S.E. 2d 752, 758 (1979) (citations omitted):

> As in the case of providing private investigators or other expert assistance to indigent defendants, we think the appointment of additional counsel is a matter within the discretion of the trial judge and required only upon a showing by a defendant that there is a reasonable likelihood that it will materially assist the defendant in the preparation of his defense or that without such help it is probable that defendant will not receive a fair trial.

The basis for the statute is to provide a fair trial, but the defendant must show that "specific evidence is reasonably available and necessary for a proper defense." *State v. Tatum*, 291 N.C. 73, 82, 229 S.E. 2d 562, 568 (1976). The defendant in this case has failed to make such a showing.

The defendant points to the State's use of twenty-six different witnesses, some of whom lived out of state, the prosecutor's not calling all the witnesses interviewed by officers in Las Vegas, the State's use of four expert witnesses and his own use of thirteen witnesses as the reasons necessitating the court's appointment of an investigator and expert witnesses. There is no showing that any evidence other than that presented at trial was reasonably available or that it would have assisted in preparation of a defense. We hold the trial court did not abuse its discretion in refusing to grant defendant's request for a court appointed investigator and expert witness.

[3]　The defendant also assigns error to the trial court's finding Dr. Frank Gaunt to be a qualified expert witness in the field of dyestuffs. He contends the witness only had experience in handling customer complaints for National Spinning Company and had never examined a piece of material to determine its original color after its piling was gone and it had been treated with a solvent as the ligature had been in this case.

Our examination of the record reveals the defendant failed to object to the court's admission of Dr. Gaunt as an expert and therefore the defendant's objection is deemed to have been

waived. *State v. Edwards and State v. Nance,* 49 N.C. App. 547, 272 S.E. 2d 384 (1980). Even had the defendant properly objected, there was sufficient foundation for Dr. Gaunt's being admitted as an expert. Dr. Gaunt was the director of technical services at National Spinning Company and studied dyestuff chemistry at the University of Leeds in England where he received his doctorate in 1942. Since that time he has worked in the field of dyestuffs and fabrics. He had experience working with all types of natural and man-made fibers and conducted "many types of investigations of returns of materials from customers where it was necessary to decide how the item looked before being subjected to unknown treatment. . . ." Because the defendant did not object, and because the witness had sufficient expertise to aid the jury and from which to express an opinion about the color of the ligature, the defendant's argument is without merit.

[4] We also find to be without merit the defendant's contention that the trial court erred in permitting an interpreter to translate the trial testimony of Nhu Thi Ngo, the victim's mother. The defendant argues that no showing was made that the witness could not speak English. Yet, the record does indicate that Nhu Thi Ngo was asked, "Do you speak English," to which she responded through the interpreter, "Very little."

As to the qualifications of the interpreter, Tran Thi Nguyet, testimony during the court's voir dire showed she was a graduate of North Carolina State University, a citizen of Vietnam and fluent in Vietnamese and English. Ms. Nguyet had taught Vietnamese to American military personnel at Fort Bragg and previously testified in other Superior Court trials. She was not related to any of the principal parties and was instructed that her translation be literal, truthful and impersonal. The interpreter's competence is borne out by the record and the defendant has not brought forward any evidence of bias on the interpreter's part or any prejudice to the defendant.

[5] We also find no error in the trial judge's instruction to the deliberating jury that they should do everything they could to reach a verdict. The defendant argues that the jury was brought back into the courtroom at the trial judge's request so they could recess for dinner. At that time the jury foreman informed the court the result of their vote was nine to three. The court ar-

ranged for the jury's transportation to a local restaurant for dinner. When the jury returned, the trial judge gave the following instruction:

> Now, ladies and gentlemen of the jury, before you resume your deliberations, as your foreman stated, it seems you've been thus far unable to agree upon a verdict. And I want to emphasize to you the fact that it is your duty to do whatever you can to reach a verdict. You should reason this matter over together as reasonable men and women and reconcile your differences, if you can, without the surrender of conscientious convictions. But no juror should surrender his or her honest convictions as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. It is your duty to do whatever you can to reach a verdict.

N.C. Gen. Stat. § 15A-1235(c) provides:

> If it appears to the judge that the jury has been unable to agree, the judge may require the jury to continue its deliberations and may give or repeat the instructions provided in subsections (a) and (b). The judge may not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals.

There is nothing on the face of the trial judge's instructions which indicates a violation of the defendant's rights. There is also no showing of prejudice to the defendant or any demonstration that the trial judge coerced a verdict by overemphasizing the jury's duty to reach a decision. We hold the trial judge did not commit prejudicial error through his subsequent instruction to the jury before it resumed deliberation.

[6] The defendant's final contention relates to the thirty-five year prison sentence the defendant received for his conviction of second degree murder. The defendant argues there should have been a sentencing hearing to insure a fair sentence. We disagree.

Even though the presumptive sentence for second degree murder under N.C. Gen. Stat. § 15A-1340.4(f)(1) is fifteen years, the trial judge complied with his statutory duties. Under our system of presumptive sentencing, the judge may impose a greater or lesser sentence than the presumptive sentence upon a

finding of aggravating or mitigating circumstances. Pursuant to N.C. Gen. Stat. § 15A-1340.4(a)(1)(f), the trial judge found as an aggravating factor the especially heinous, atrocious or cruel nature of the crime. He found the defendant's lack of a criminal record to be a mitigating factor. In accordance with N.C. Gen. Stat. § 15A-1340.4(b), the trial court then found that the aggravating factor outweighed the mitigating factor. As N.C. Gen. Stat. § 15A-1340.4(a) allows, the court is free to emphasize one factor more than another, and the discretionary weighing of mitigating and aggravating factors does not lend itself to a simple mathematical formula. *State v. Davis*, 58 N.C. App. 330, 293 S.E. 2d 658 (1982). We hold the trial court complied with the statute and did not abuse its discretion in finding that murder by strangulation was an especially heinous and cruel crime which outweighed defendant's lack of a criminal record.

We find the defendant had a fair trial free from prejudicial error.

No error.

Judges WHICHARD and BRASWELL concur.